[No. S058027. Aug. 13, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE LUIS MENDOZA et al., Defendants and Appellants.

**COUNSEL**

Eric S. Multhaup, William M. Robinson and Mark D. Greenberg, under appointments by the Supreme Court, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman, Sharon G. Birenbaum and Violet M. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

CHIN, J.—Defendant Juan Manuel Valdez was convicted of criminal offenses as an aider and abettor of the person who directly perpetrated the crimes. The mental state necessary for conviction as an aider and abettor is *knowledge* of the perpetrator's criminal purpose and the *intent or purpose* of committing, encouraging, or facilitating the commission of the target offense. (See generally, *People* v. *Prettyman* (1996) 14 Cal.4th 248, 259 [58 Cal.Rptr.2d 827, 926 P.2d 1013].) We must decide whether the finder of fact, here a jury, may consider evidence of defendant's voluntary intoxication in deciding whether he had this necessary mental state. We conclude that the jury may consider voluntary intoxication as to both knowledge and intent in deciding guilt as to all the charged offenses. Accordingly, we reverse the judgment of the Court of Appeal and remand the matter for that court to decide whether the trial court prejudicially misinstructed the jury in this regard.

## I. FACTS AND PROCEDURAL HISTORY

### A. *The Evidence at Trial*[1]

On April 9, 1993, Mary Plell hosted a party at a rented warehouse in Watsonville. She asked her brother, David Plell, to serve as the doorman to ensure that no one under the influence of alcohol entered. Chuck Christ and

---

[1] This factual summary is drawn from the Court of Appeal's summary, paraphrased and condensed to focus on the issue we are reviewing.

Kirk DeHaan came to the party to supply and set up the sound system. The party began about 10:00 p.m., and more than 100 people attended it.

Earlier in the evening, defendants Jose Luis Mendoza and Juan Manuel Valdez and their friends, Gabriel Gonzalez and Scott Smith, had decided to obtain some beer, drive into the hills, and drink the beer. Smith was to be the "designated driver" and not drink. Because they were underage, they had someone else purchase a case of beer for them. They went into the hills and began drinking between 10:00 p.m. and 10:30 p.m. They drank all but three of the beers in about three hours. Valdez had eight to ten beers. As they drove back into town, they opened the last three beers. Then Gonzalez noticed the party at the warehouse. They "decided to stop and check out the party."

Sometime after 1:00 a.m., Mendoza, Valdez, and Gonzalez approached the warehouse with beer cans in their hands. Mary did not know them. She noticed immediately that they were "very drunk" and "belligerent," and she indicated to her brother David that she did not want them admitted to the party. The three approached David "standing shoulder to shoulder" and attempted to gain admittance to the party. David noticed they were intoxicated. A contentious verbal exchange followed, which led to a physical confrontation between David and Gonzalez and Mendoza. David and Gonzalez struggled, and David struck Gonzalez at least once with his hand, in which he held a flashlight. Gonzalez sustained a head injury that bled profusely. Mendoza was also injured. David, Mary, and their friends asked Valdez, Mendoza, and Gonzalez to leave. Further verbal confrontations followed. Valdez, Mendoza, and Gonzalez threatened to come back with a gun and kill the others. They then got into a car and left.

Valdez and Mendoza took Gonzalez to a nearby hospital, arriving at 1:36 a.m., and left him there with Smith. Gonzalez had a lacerated scalp, not a serious injury. On the way to the hospital, Valdez indicated that he wanted to return to the warehouse and fight the "bouncer." He told Mendoza to drive from the hospital to a house where defendant Valencia, one of Valdez's best friends, was staying. Valdez was still intoxicated. Valdez awakened Valencia and told him what had happened. He said he wanted to go back to the party and fight with "some people," and that they would need protection because "the people at the party were very big." They drove to Valencia's mother's house, where Valencia and Valdez both obtained "sticks." Then they went to the warehouse.

David left the party at Mary's request. Around 1:30 a.m., she decided to lock all the doors and not let anyone else in. A short while later, Valdez,

Mendoza, and Valencia arrived at the warehouse, each with a weapon in his hand. Another verbal confrontation ensued, with the three outside and the partygoers inside the warehouse. Valdez beat on the door with a tire iron, demanded to be let in, and threatened to "kill you all." He also went over to a BMW parked in front of the warehouse and punctured its tires. He struck another vehicle with his tire iron. The three men then left. Valdez was still angry and wanted to return to the warehouse. Valdez and Mendoza mentioned Valencia's rifle, and Valencia decided to get it "for protection." They drove to Valencia's mother's house, where Valencia retrieved a loaded .22-caliber semiautomatic rifle. Valencia put the rifle in the trunk. They returned to the warehouse. When they arrived, Valencia put the rifle in the backseat of the car.

A little after 2:00 a.m., the partygoers inside the warehouse heard defendants banging on the large metal roll-up door to the warehouse. The music was turned off while the banging continued. It lasted for about four minutes. About five minutes after it stopped, the music resumed. A few minutes later, Christ and DeHaan went outside. They had heard that vehicles were being vandalized. The three defendants confronted them with weapons. Christ and DeHaan started to back away. Valdez gestured with his hand towards Valencia, apparently pointing in the direction from which defendants had come. Valencia returned to the car and retrieved his rifle. Christ asked them to leave. Valencia approached DeHaan and pointed the rifle at his chest. DeHaan raised his hands "in a passive surrendering motion." Valdez poked his stick-like weapon at DeHaan about a foot away from DeHaan's face. DeHaan backed away from Valdez, and DeHaan and Christ ran towards the back of the warehouse.

After DeHaan and Christ ran a short distance, they heard about 10 shots. Valencia fired his rifle at the large metal roll-up door at least 11 times from a distance of between 15 and 30 feet. At least six shots penetrated the door and reached the crowd of dancers inside. One person who was dancing about 10 feet from the door was struck in the head by a bullet and killed. Five others were struck by bullets and injured.

In his defense, Valdez presented evidence of his good character for nonviolence, honesty, truthfulness, and trustworthiness. He also testified, claiming that none of the men had ever made any threats on any of their visits to the warehouse. He admitted he became "real mad" because of the injury to Gonzalez and urged the "bouncer" to fight them. Valdez testified that he had never been in a fight before. He obtained Valencia's assistance because he was afraid that the people at the party would interfere with his desire for vengeance on the bouncer. He wanted Valencia to serve "as a

backup" because Valencia "knew how to fight." Valdez understood that the rifle was being brought "for protection." He testified that he could remember coming to the warehouse only twice: first with Gonzalez, and only once with Valencia. In his version of the events, the two visits with Valencia were consolidated into one. He contended that he had banged on the door merely to try to get the "bouncer" to come out and fight him and denied having done anything to the BMW's tires.

Valdez denied making any "signal" for Valencia to fetch his rifle, and he claimed that he was unaware that Valencia was even holding the rifle until he heard the shots. Valdez expressly denied intending for "the building to be shot" or for anyone to be hurt. He also denied knowing that Valencia was going to fire the rifle at the building or at any person. He asserted that his sole purpose was to "fight the bouncer." An expert on the effects of alcohol testified that intoxication can cause memory lapses, and these memory losses are likely to be incomplete so that the person remembers fragments of the events. Such a memory loss might involve the blending of two events into one. However, a memory loss that is self-serving because it eliminates incriminating events is likely to be feigned rather than genuine.

### B. *Procedural History*

As relevant here, an indictment charged defendants Mendoza, Valencia, and Valdez with five counts of attempted murder (Pen Code, §§ 187, 664),[2] and one count each of murder (§ 187) and discharging a firearm at an occupied building (§ 246). The indictment also alleged that Valencia personally used, and each defendant was armed with, a firearm in the commission of the offenses. (§§ 12022, subd. (a)(1), 12022.5.) The prosecution proceeded against Valdez solely on the theory that he aided and abetted Valencia.

Valdez asked the court to give four special instructions relating voluntary intoxication to the mental state required for aiding and abetting. The prosecution agreed that some instruction was appropriate but objected to the requested instructions as argumentative and misleading. Ultimately, the court gave this instruction on intoxication: "Under the law, it is the general rule that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of being in such condition. [¶] Thus, [in] the crime of shooting at an occupied building . . . the fact that the defendant was voluntarily intoxicated is not a defense and does not relieve defendant of responsibility for the crime. This rule applies in this case only to the crimes of shooting at an occupied building. . . . [¶] However, there is

---

[2]All further statutory references are to the Penal Code.

an exception to this general rule, namely, where a specific intent or knowledge is an essential element of a crime. In such event, you should consider the defendant's voluntary intoxication in your determination of whether the defendant possessed the required specific intent or knowledge of at the time of the commission of the alleged offense. [¶] Thus, in the crimes of murder and attempted murder . . . a necessary element is the existence in the mind of the defendant of a certain specific intent or knowledge which is included in the definition of the crimes set forth elsewhere in these instructions. [¶] If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in determining whether or not such defendant had such specific intent or knowledge."

The court also instructed: "A person aids and abets the commission or attempted commission of a crime when he or she with knowledge of the unlawful purpose of the perpetrator and with the intent or the purpose of committing, encouraging or facilitating the commission of the crime by act or advice aids, promotes, encourages or instigates the commission of a crime."

The jury convicted each defendant of second degree murder, five counts of attempted murder, and shooting at an occupied building, and found all the weapon allegations true. The court sentenced each defendant to prison. Each appealed. The Court of Appeal modified the judgment or reversed and remanded for resentencing in certain limited respects. It affirmed each of the convictions. The majority held that evidence of voluntary intoxication was not admissible "to disprove the intent element of the People's theory that [Valdez] had aided and abetted Valencia." Justice Mihara disagreed and would have reversed Valdez's convictions for murder and attempted murder.

All three defendants petitioned for review. We denied the petitions of Valencia and Mendoza and granted the petition of Valdez, limited to the question whether the jury may consider the effect of voluntary intoxication on the existence of the mental state necessary for aiding and abetting.

## II. DISCUSSION

### A. *Background*

██ "All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed." (§ 31.) Accordingly, an aider and abettor "shares the guilt of the actual perpetrator." (*People* v. *Prettyman, supra,* 14 Cal.4th at p. 259.) The mental state necessary for conviction as an aider and abettor, however, is different from the mental state necessary for conviction as the actual perpetrator.

The actual perpetrator must have whatever mental state is required for each crime charged, here shooting at an inhabited building, murder, and attempted murder. An aider and abettor, on the other hand, must "act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318], original italics.) The jury must find "the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense . . . ." (*People* v. *Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392], also quoted in *People* v. *Prettyman*, *supra*, 14 Cal.4th at p. 261.) Once the necessary mental state is established, the aider and abettor is guilty not only of the intended, or target, offense, but also of any other crime the direct perpetrator actually commits that is a natural and probable consequence of the target offense. (*People* v. *Prettyman*, *supra*, 14 Cal.4th at pp. 260-262.)

In this case, defendant Valdez was tried solely as an aider and abettor of Valencia, the direct perpetrator of the crimes. To convict Valencia of shooting at an occupied building, the jury had to find what is called general criminal intent, i.e., it had to find that Valencia "intended to do the proscribed act." (*People* v. *Jischke* (1996) 51 Cal.App.4th 552, 556 [59 Cal.Rptr.2d 269]; see generally, *People* v. *Hood* (1969) 1 Cal.3d 444, 456-457 [82 Cal.Rptr. 618, 462 P.2d 370] (*Hood*).) For the charge of second degree murder, the jury had to find that Valencia acted with either express or implied malice. (See *People* v. *Whitfield* (1994) 7 Cal.4th 437, 450 [27 Cal.Rptr.2d 858, 868 P.2d 272] (*Whitfield*).) For the charge of attempted murder, the jury had to find that Valencia intended to kill. (*People* v. *Collie* (1981) 30 Cal.3d 43, 62 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].) To convict Valdez as an aider and abettor of any of these crimes, the jury had to find that he acted with (1) knowledge of Valencia's criminal purpose, and (2) the intent to encourage or facilitate that purpose. Once the jury made these findings, it could convict Valdez of the intended crime and any other crime Valencia actually committed that was a natural and probable consequence of the intended crime. Thus, if the jury found Valdez knowingly and intentionally aided and abetted Valencia in shooting at an occupied building, it could also have convicted him of murder and attempted murder, if it found that Valencia committed those crimes and that they were natural and probable consequences of shooting at an occupied building.

We must decide whether evidence of voluntary intoxication is admissible on the question whether a defendant tried as an aider and abettor had the required knowledge and intent. Resolution of the question requires us to interpret section 22. Initially enacted in 1872, section 22 was amended in

1981 and 1982 and, after the commission of the crimes in this case, again in 1995. Because the historical development of section 22 is relevant to this question, we quote each version.

Before 1981, section 22 provided: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act." (Enacted as § 22 of 1872 Pen. Code.)

In 1981, the Legislature amended section 22 to provide, in pertinent part: "(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, or malice aforethought, with which the accused committed the act.

"(b) Whenever the actual existence of any mental state, including, but not limited to, purpose, intent, knowledge, or malice aforethought, is a necessary element to constitute any particular species or degree of crime, evidence that the accused was voluntarily intoxicated at the time of the commission of the crime is admissible on the issue as to whether the defendant actually formed any such mental state." (Stats. 1981, ch. 404, § 2, p. 1592.)

In 1982, the Legislature amended section 22 to provide, as relevant: "(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation or malice afore-thought, with which the accused committed the act.

"(b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (Stats. 1982, ch. 893, § 2, pp. 3317-3318.) The Legislature stated that the 1982 amendment was "declaratory of existing law." (Stats. 1982, ch. 893, § 5, p. 3318.)

Most recently, in 1995, effective January 1, 1996, the Legislature amended section 22 to provide, as relevant: "(a) No act committed by a

person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.

"(b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (Stats. 1995, ch. 793, § 1; see *People* v. *Castillo* (1997) 16 Cal.4th 1009, 1014, fn. 1 [68 Cal.Rptr.2d 648, 945 P.2d 1197].)

We have already reviewed the purpose and effect of the 1981 and 1982 amendments to section 22. Before 1981, intoxication was generally relevant to the defense of diminished capacity. (See *People* v. *Saille* (1991) 54 Cal.3d 1103, 1109-1111 [2 Cal.Rptr.2d 364, 820 P.2d 588].) In *Hood*, this court held that intoxication was relevant to negate the existence of a specific intent but not a general criminal intent, and that assault is a general intent crime for this purpose. (*Hood, supra*, 1 Cal.3d at pp. 455-459.) The 1981 amendment to section 22 was part of a broader statutory revision that abolished the defense of diminished capacity while preserving the relevance of voluntary intoxication to the question whether the defendant *actually* had the necessary mental state for the charged offense. (*Whitfield, supra*, 7 Cal.4th at p. 447.) "The broad references in subdivision (b) of section 22, as amended in 1981, to 'any mental state' and to 'intent' raised concerns, however, that the statute could be construed, contrary to the Legislature's intent, to alter the well-settled rule that evidence of voluntary intoxication is inadmissible to negate the existence of *general* criminal intent." (*Id.* at p. 448, original italics.) To guard against this concern, "the Legislature, in 1982, promptly revised section 22, subdivision (b), to its [then] present form, replacing the term 'intent' with the phrase 'a required specific intent' and adding the concluding phrase 'when a specific intent crime is charged.' [Citation.] The Legislature stated that this amendment was 'declaratory of existing law,' thus making clear that it was seeking simply to clarify the scope of the 1981 amendments." (*Ibid.*)

In *Whitfield*, we concluded "that section 22 was not intended, in murder prosecutions, to preclude consideration of evidence of voluntary intoxication on the issue whether a defendant harbored malice aforethought, whether the prosecution proceeds on a theory that malice was express or implied." (*Whitfield, supra*, 7 Cal.4th at p. 451.) Justice Mosk, joined by Chief Justice

Lucas and, in a separate opinion, Justice Baxter, would have found voluntary intoxication not admissible to negate implied malice. (*Id.* at pp. 456-477 (conc. and dis. opn. of Mosk, J.); *id.* at p. 477 (conc. and dis. opn. of Baxter, J.).) The most recent amendment to section 22 came in apparent reaction to this holding. The Legislative Counsel's Digest to the bill amending section 22 stated: "Under existing law, as held by the California Supreme Court in People v. Whitfield, 7 Cal.4th 437, the phrase 'when a specific intent crime is charged' includes murder even where the prosecution relies on a theory of implied malice. [¶] This bill would provide, instead, that evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (Legis. Counsel's Dig., Sen. Bill No. 121 (1995-1996 Reg. Sess.).)

### B. *Voluntary Intoxication and Aider and Abettor Liability*

The narrow question in this case is whether section 22 permits defendants tried as aiders and abettors to present, and the jury to consider, evidence of intoxication on the question whether they had the requisite mental states of knowledge and intent.

The Attorney General argues that neither the intent nor knowledge component of aider and abettor liability is "a required specific intent" under section 22, subdivision (b), and, therefore, "voluntary intoxication is never admissible as to aiding and abetting liability." We disagree.[3] **(3)** The division of crimes into two categories, one requiring "general intent" and

---

[3]Before the Court of Appeal decision in this case, no court addressed whether section 22 permits consideration of intoxication on the question of aiding and abetting liability. A number of cases contain statements that, pulled from context, arguably support one position or the other. In *People* v. *Horton* (1995) 11 Cal.4th 1068, 1119 [47 Cal.Rptr.2d 516, 906 P.2d 478], we said, "Notwithstanding the abolition of the diminished capacity defense, evidence of voluntary intoxication is relevant to the extent it bears upon the question whether the defendant *actually* had the requisite specific mental state required for commission of the crimes at issue." (Original italics.) The broad reference to "mental state" supports the argument that intoxication is relevant to the mental state required for aiding and abetting liability. In *People* v. *Garrison* (1989) 47 Cal.3d 746, 797 [254 Cal.Rptr. 257, 765 P.2d 419] (conc. and dis. opn. of Broussard, J.), Justice Broussard said, "Accomplice liability depends upon a general criminal intent, not upon shared intent to commit the target offense." The reference to "general criminal intent" supports the argument that intoxication may not be considered as to accomplice liability. Some recent decisions have concluded that the court need not instruct on specific intent as to aiding and abetting liability. (*People* v. *Olguin* (1994) 31 Cal.App.4th 1355, 1380 [37 Cal.Rptr.2d 596]; *People* v. *Francisco* (1994) 22 Cal.App.4th 1180, 1190-1191 [27 Cal.Rptr.2d 695]; *People* v. *Torres* (1990) 224 Cal.App.3d 763, 770 [274 Cal.Rptr. 117].) Older decisions have indicated that intoxication is relevant to aiding and abetting liability. (*People* v. *Minichilli* (1984) 161 Cal.App.3d 660, 671 [207 Cal.Rptr. 766];

one "specific intent," is both simplistic (some crimes have other required mental states such as knowledge) and potentially confusing. Ultimately, the designation of a mental state as specific or general for these purposes is a policy decision. "The key is whether policy considerations permit the introduction of voluntary intoxication evidence to negate an element of the crime." (*Whitfield*, *supra*, 7 Cal.4th at p. 463 (conc. and dis. opn. of Mosk, J.).)

We first struggled with the question whether to designate a mental state as general intent—to prohibit consideration of voluntary intoxication—or specific intent—to permit such consideration—in *Hood*. In that case, the defendant shot a police officer and was convicted of assaultive crimes. We reversed the judgment for reasons not relevant here, but for purposes of retrial, we considered "the question of the effect of intoxication on the crime of assault with a deadly weapon." (*Hood*, *supra*, 1 Cal.3d at p. 452.) We explained that the "distinction between specific and general intent crimes evolved as a judicial response to the problem of the intoxicated offender. That problem is to reconcile two competing theories of what is just in the treatment of those who commit crimes while intoxicated. On the one hand, the moral culpability of a drunken criminal is frequently less than that of a sober person effecting a like injury. On the other hand, it is commonly felt that a person who voluntarily gets drunk and while in that state commits a crime should not escape the consequences." (*Id.* at p. 455.) Thus, courts came to distinguish "between so-called specific intent and general intent crimes," with intoxication relevant to the former but not the latter. (*Id.* at p. 456.)

Using the designations of specific or general intent, however, did not end the conceptual difficulties. ▪ "Specific and general intent have been notoriously difficult terms to define and apply . . . ." (*Hood*, *supra*, 1 Cal.3d at p. 456.) "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." (*Id.* at pp. 456-457; also quoted in *People* v. *Davis* (1995) 10 Cal.4th 463, 519, fn. 15 [41 Cal.Rptr.2d 826, 896 P.2d 119].) Sometimes, even this definition is inadequate. In *Hood*, we found that the intent required for assault could be characterized as either specific or general under this test. In that event, we said, "the decision whether or not to give effect to evidence of intoxication must rest on other considerations." (*Hood*, *supra*, 1 Cal.3d at

*People* v. *Vasquez* (1972) 29 Cal.App.3d 81, 87 [105 Cal.Rptr. 181].) Because none of these cases confronted the precise question before us, we do not rely on them.

p. 458.) Our conclusion that assault is a general intent crime for this purpose—precluding consideration of intoxication—ultimately rested on these "other considerations." ██ "[A] drunk man is capable of forming an intent to do something simple, such as strike another, unless he is so drunk that he has reached the stage of unconsciousness. What he is not as capable as a sober man of doing is exercising judgment about the social consequences of his acts or controlling his impulses toward anti-social acts. He is more likely to act rashly and impulsively and to be susceptible to passion and anger. It would therefore be anomalous to allow evidence of intoxication to relieve a man of responsibility for the crimes of assault with a deadly weapon or simple assault, which are so frequently committed in just such a manner." (*Ibid.*).

Although the Legislature has repeatedly amended section 22 since *Hood*, the basic framework that *Hood* established for designating a criminal intent as either specific or general for these purposes has survived. As we explained in *Whitfield*, the purpose and effect of the 1981 amendment to section 22 was to eliminate the defense of diminished *capacity*, while preserving the relevance of intoxication in deciding whether the defendant *actually* had the necessary mental state. (*Whitfield, supra*, 7 Cal.4th at p. 447.) The 1982 amendment merely clarified that the 1981 amendment did not extend the admissibility of intoxication to general intent crimes. (*Id.* at p. 448.) In *Whitfield*, both the majority and Justice Mosk used the *Hood* approach in reaching their respective—and conflicting—conclusions regarding intoxication and implied malice. (*Whitfield, supra*, 7 Cal.4th at pp. 449-450 (maj. opn.); *id.* at pp. 463-464, 476 (conc. and dis. opn. of Mosk, J.).)

██ Citing language in section 22 that has never been substantially changed, the Attorney General argues that the "established principle in the law for more than a century has been that '[n]o act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition.' " We agree in general. As Justice Baxter observed in *Whitfield*, "section 22, subdivision (b), as amended in 1982, is an exception to the rule that '[n]o act . . . is less criminal by reason of' the perpetrator's voluntary intoxication (*id.*, subd. (a)) . . . ." (*Whitfield, supra*, 7 Cal.4th at p. 477 (conc. and dis. opn. of Baxter, J.).) The Attorney General also argues that the "definition of aiding and abetting fits more appropriately within the description of general criminal intent. An aider and abettor's intent is merely to encourage or facilitate the perpetrator in his commission of a crime. The aider and abettor's goal is accomplished when the act of encouragement or facilitation is committed. The law does not require the aider and abettor 'to do some further act or achieve some additional consequence.' "

This argument, however, disregards the nature of the "act" the aider and abettor commits. Unlike the act of the direct perpetrator, the act of the aider and abettor is not inherently criminal. Indeed, the aider and abettor's act may be, and often is, innocuous when divorced from the culpable mental state. (To the extent the act is itself inherently criminal, it may subject the person to criminal liability as a direct perpetrator.) For example, the act of handing a baseball bat to another person is not itself criminal. Baseball players, friends, and parents do it routinely. That act, not being criminal by itself, cannot be made either more or less criminal by the circumstance that the person is intoxicated. However, if the person committing that act *knows* that the other person will hit a third person over the head with the bat, and *intends* to facilitate that further act, the person can be criminally liable as an aider and abettor for that further act and for any other crime actually committed that is a reasonably foreseeable consequence of the intended crime. The act of hitting someone on the head with a bat *is* inherently criminal and, as *Hood* and section 22 teach, is not less criminal because the hitter is intoxicated. But the alleged aider and abettor is liable for that inherently criminal act only if the necessary mental states of knowledge and intent exist. To say that the act of the aider and abettor should not be less criminal because of intoxication is meaningless until one determines that the alleged aider and abettor is liable for some criminal act.

The intent requirement for an aider and abettor fits within the *Hood* definition of specific intent. To be culpable, an aider and abettor must intend not only the act of encouraging and facilitating but also the *additional* criminal act the perpetrator commits. The *latter* act is not made less criminal by reason of intoxication. In our hypothetical, if the alleged aider and abettor intended only the act of handing a bat to another person, and did not intend "to do a further act or achieve a future consequence" (*Hood, supra,* 1 Cal.3d at p. 457), that person would not intend that any criminal act at all be committed. Aiding and abetting liability attaches only with the intent that the direct perpetrator commit a further, criminal, act in order to achieve the future consequence of that act.

We see no "other considerations" (*Hood, supra,* 1 Cal.3d at p. 458) that would prohibit alleged aiders and abettors from presenting evidence they did not know of the perpetrator's purpose and did not intend to aid it because of intoxication. *Awareness* of the direct perpetrator's purpose is critical for the alleged aider and abettor to be culpable for that perpetrator's act. A person may lack such awareness for many reasons, including intoxication. A person who is actually unaware that his or her noncriminal act might help another person commit a crime should not be deemed guilty of that crime and all of its reasonably foreseeable consequences even if intoxication contributes to, or is the sole reason for, that lack of awareness.

In *Hood*, we were concerned that a "drunk" person should not be relieved of responsibility for criminal acts that are frequently committed *because* the person is drunk. Justice Mosk expressed a similar concern in *Whitfield*: "[A]lcohol intoxication naturally lends itself to the crime's commission because it impairs the sound judgment or lowers the inhibitions that might stop a sober individual from committing a highly dangerous act leading to another's death." (*Whitfield, supra*, 7 Cal.4th at p. 463 (conc. and dis. opn. of Mosk, J.).) This concern does not have the same force regarding an alleged aider and abettor as it has regarding the person who actually commits the dangerous act. Anyone, including a drunk person, who knowingly and intentionally aids and abets a criminal act is guilty. Intoxication is relevant only to show the person did *not* act knowingly and intentionally. A drunk person does not *unknowingly* and *unintentionally* help others commit crimes significantly more often than other persons.

The majority of the Court of Appeal in this case, holding that Valdez should not be allowed to rely on intoxication, stated: "No measurable intellectual sophistication could have been involved in understanding that Valencia intended to shoot at a door behind which a party was in progress, or in deciding to encourage him to do it." We agree. A jury could well doubt Valdez's defense. But the question is whether that defense is legally *permissible*, not how much it is factually supported in this case. It remains true that if Valdez is guilty, his guilt is due to Valencia's acts, not his own. If, for whatever reason, Valdez did not, in fact, understand that Valencia intended to shoot, and therefore did not intentionally aid that shooting, he is not criminally liable for it. The majority below also state that "as *Hood* makes clear, voluntary intoxication does not excuse rashness, impulsiveness, passion, or anger." The statement is correct, but it does not address the guilt of an aider and abettor. Intoxication may explain lack of knowledge that someone else intends to commit a criminal act; the lack of knowledge would excuse the person from liability for that act.

The majority below also noted that admitting evidence of intoxication on the question of aiding and abetting liability could allow the defendant to escape criminal liability. It found its conclusion consistent with our "recent acknowledgment of the concept that the distinction between specific and general intent crimes ' "is a device to 'permit evidence of intoxication to reduce the crime to a lower degree, but not to admit evidence of self-induced intoxication if it would result in total acquittal.' " [Citations.]' (*Whitfield, supra*, 7 Cal.4th at p. 451.) Negation of the mental element of aiding and abetting would necessarily require 'total acquittal' of a defendant who, like Valdez, is charged only on an aiding and abetting theory. Thus a reading of [section 22,] subdivision (b) that would permit such negation would run counter to the concept the Supreme Court acknowledged."

*Whitfield* involved a defendant who *personally* killed another person, i.e., committed an inherently criminal act. We recognized the importance of not allowing a person who commits a criminal act to escape liability altogether because of intoxication. That concern does not apply to someone charged as an aider and abettor. It is true, of course, that someone who did not personally commit a criminal act and also lacked the mental state to be liable for someone else's criminal act is guilty of no crime at all. But this conclusion does not allow a person to escape responsibility for a criminal act; it only means the person committed no criminal act at all. The Attorney General argues that this result "would allow the aider and abettor to escape liability altogether." It would not. An "aider and abettor" would not escape liability. Only a person who is found *not* to be an aider and abettor would escape.

For these reasons, we conclude that the intent requirement for aiding and abetting liability is a "required specific intent" for which evidence of voluntary intoxication is admissible under section 22. This conclusion raises two additional questions.

The first is whether the jury may consider intoxication on both the defendant's knowledge and intent or only on intent. As relevant, section 22 referred (and still refers) to "a required specific intent" but not specifically to knowledge. However, for these purposes we cannot mechanically divide the defendant's mental state into knowledge and intent. One cannot intend to help someone do something without knowing what that person meant to do. (See *People* v. *Williams* (1997) 16 Cal.4th 635, 676 [66 Cal.Rptr.2d 573, 941 P.2d 752] ["Implicit in the notion of someone 'sharing' another's intent is knowledge of that intent . . . ."].) A trial court could not meaningfully instruct a jury to consider evidence of intoxication in deciding whether a defendant *intended* to further the perpetrator's criminal purpose but not to consider that same evidence in deciding whether the defendant *knew* what that purpose was. Therefore, to quote and adapt *Whitfield*, although knowledge "may not fall literally within the *Hood* formulation of specific intent, the element [of aiding and abetting liability] that requires that the defendant act with knowledge of [the perpetrator's criminal intent] is closely akin to *Hood*'s definition of specific intent, which requires proof that the defendant acted with a specific and particularly culpable mental state." (*Whitfield, supra*, 7 Cal.4th at p. 450; see also *People* v. *Reyes* (1997) 52 Cal.App.4th 975, 982-986 [61 Cal.Rptr.2d 39] [voluntary intoxication may be considered on knowledge requirement of receiving stolen property].)

The second additional question is whether the jury could consider intoxication in deciding the defendant's guilt as an aider and abettor on *all* the

charged crimes or only on those charged crimes that require the *perpetrator* to have a specific intent. At the time of these crimes, section 22 permitted intoxication evidence to negate "a required specific intent" or other specified mental state "when a specific intent crime is charged." We believe the language, "when a specific intent crime is charged," refers to the same "required specific intent" for which the statute allows evidence of intoxication, including the intent requirement of an aider and abettor. We see no indication the Legislature intended there be some "required specific intent[s]" for which, nevertheless, evidence of intoxication is inadmissible. The mental state required for an aider and abettor is the same for all crimes and is independent of the perpetrator's mental state. The aider and abettor must specifically intend to aid the perpetrator, whether the intended crime itself requires a general or specific intent on the part of the perpetrator.

Because of the natural and probable consequences doctrine, limiting the admissibility of intoxication evidence for an alleged aider and abettor to crimes which require the perpetrator to have a specific intent would often effectively prevent that person from relying on intoxication even in defense to a specific intent crime. The rule would be arbitrary and have no relation to culpability. For example, in the hypothetical of a person handing a baseball bat to another who then uses it to assault a third party, assume that the assault was fatal but also that the person was unaware, due to intoxication, of the perpetrator's criminal intent. That person could be charged as an aider and abettor of both assault with a deadly weapon and murder, with assault being the target offense and murder a reasonably foreseeable consequence of the target offense. If the aider and abettor were precluded from presenting evidence of intoxication in defense to the assault charge because it is a general intent crime (*Hood, supra*, 1 Cal.3d 444), the alleged aider and abettor would effectively be precluded from relying on intoxication as a defense even to the specific intent crime of murder (or express malice murder under the current section 22). The prosecution could simply argue the person was guilty of assault because he or she intended to aid and abet that general intent crime and then also guilty of murder on the theory that murder is a natural and probable consequence of assault with a deadly weapon.

It would be anomalous to conclude Valdez could rely on intoxication as to murder but not the general intent crime of shooting at an occupied building. In that situation, a finding that he is guilty of the general intent crime would result in a finding that he is guilty of any reasonably foreseeable other crime the direct perpetrator commits, including murder, even if that other crime is a specific intent crime. Thus, if Valdez were unaware Valencia was going to shoot into the occupied building because he was intoxicated, but he could

not present evidence of intoxication as to that crime, he could be found guilty even of murder, because murder is a foreseeable consequence of shooting into an occupied building. The required mental state of the aider and abettor does not vary from crime to crime; the admissibility of evidence of intoxication should also not vary.

The statutory language does not compel a different conclusion. The Legislature deleted the language, "when a specific intent crime was charged," when it amended section 22 in 1995. Defendant argues he is entitled to have the new statute's "favorable provisions applied retroactively to him." The Court of Appeal majority below was "inclined to the view that the 1995 change did *not* demonstrate a legislative intention to expand the meaning of 'specific intent' in subdivision (b) . . . ." (Original italics.) We agree that the 1995 amendment did not expand the admissibility of intoxication evidence. The Legislature's sole intent was to *reduce* the admissibility of intoxication by overruling our specific holding in *Whitfield*. But this conclusion does not aid the Attorney General's position. The fact that the Legislature, in *narrowing* the use of intoxication, deleted the language, "when a specific intent crime is charged," indicates that that language did not, by itself, preclude the use of intoxication evidence otherwise permitted under section 22. Section 22 has always permitted evidence of the effect of intoxication as to any specific intent, including the intent of an aider and abettor.

Our holding is very narrow. Defendants may present evidence of intoxication solely on the question whether they are liable for criminal acts as aiders and abettors. Once a jury finds a defendant did knowingly and intentionally aid and abet a criminal act, intoxication evidence is irrelevant to the *extent* of the criminal liability. A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime but also of any other crime the perpetrator actually commits that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. (*People* v. *Prettyman*, *supra*, 14 Cal.4th at pp. 260-262.) Intoxication is irrelevant in deciding what is reasonably foreseeable. In this case, if Valdez intended to aid and abet Valencia in shooting at the occupied building, Valdez will not be allowed to argue that his intoxication prevented him from foreseeing that Valencia might attempt to or actually commit murder. Intoxication evidence is admissible only to help decide whether the defendant is legally liable for a criminal act, not to show that the act is less criminal because of the intoxication.

We also stress that although evidence of intoxication is admissible on the question of aider and abettor liability, a jury can still find an intoxicated

person guilty as an aider and abettor. Evidence of intoxication, while legally *relevant*, may be factually unconvincing. "[A]s with any evidence, the jury may give this testimony whatever weight it deems appropriate in light of the evidence as a whole." (*People* v. *Humphrey* (1996) 13 Cal.4th 1073, 1088 [56 Cal.Rptr.2d 142, 921 P.2d 1].) That a jury need not accept an intoxication defense was demonstrated vividly in *Whitfield, supra*, 7 Cal.4th 437, where we affirmed a conviction of implied malice murder based on driving a vehicle while intoxicated. Juries may and, no doubt, often do reject an intoxication claim. That circumstance does not, however, make the claim legally irrelevant, or intoxication evidence inadmissible.

Our conclusion also makes the law understandable to the jury. If the court gives any instruction at all on the relevance of intoxication (see *People* v. *Castillo, supra*, 16 Cal.4th at p. 1014 [no sua sponte duty to instruct on intoxication]), it might simply instruct that the jury may consider intoxication in determining whether a defendant tried as an aider and abettor had the required mental state. It might also instruct that the intoxication evidence is irrelevant on the question whether a charged crime was a natural and probable consequence of the target crime. The court would not additionally be required to parse out those elements of each crime charged for which the evidence could be considered or distinguish between the knowledge and the intent requirements.

### C. *Application to This Case*

■   The remaining question is whether the court prejudicially misinstructed in this case. At trial, the parties and court agreed the court should give some instruction on intoxication, and it did. The parties dispute whether the actual instruction was adequate. In dissent below, Justice Mihara found the instructions prejudicially defective. Because the majority concluded Valdez was not entitled to any instructions on intoxication, it never decided whether the instructions were adequate or any error prejudicial.

The applicable legal standards are settled. We recently held that a trial court has no sua sponte duty to instruct on the relevance of intoxication, but if it does instruct, as the court here did, it has to do so correctly. (*People* v. *Castillo, supra*, 16 Cal.4th at pp. 1014-1015.) The appellate court should review the instructions as a whole to determine whether it is "reasonably likely the jury misconstrued the instructions as precluding it from considering" the intoxication evidence in deciding aiding and abetting liability. (*Id.* at p. 1017.) Any error would have the effect of excluding defense evidence and is thus subject to the usual standard for state law error: "the court must reverse only if it also finds a reasonable probability the error affected the

verdict adversely to defendant." (*People* v. *Humphrey*, *supra*, 13 Cal.4th at p. 1089.)

Because the majority below did not decide whether the instructions were prejudicially defective, we "consider it appropriate to remand this matter to the Court of Appeal to permit that court to determine" the question in the first instance. (*People* v. *Cahill* (1993) 5 Cal.4th 478, 510 [20 Cal.Rptr.2d 582, 853 P.2d 1037] [remanding to the Court of Appeal to apply a harmless error test enunciated in that decision]; see also Cal. Rules of Court, rule 29.4(b) [this court "may decide one or more issues and transfer the cause to a Court of Appeal for decision of any remaining issues in the cause"].)

### III. CONCLUSION

We reverse the judgment of the Court of Appeal and remand the matter for further proceedings consistent with this opinion.

George, C. J., Kennard, J., and Werdegar, J., concurred.

**MOSK, J.**—I generally concur in the opinion of the court.

I write separately because I believe that the result that we reach may be obtained by an even straighter path.

A person may be vicariously liable for another's crime as an aider and abettor if he knows of the perpetrator's criminal purpose and intends its object. (*People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].) He need not commit the act, or possess the mental state, required for the crime itself. (*People* v. *Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392].)

The question presented in this cause is whether a person who is charged with a crime and prosecuted as an aider and abettor may introduce evidence of voluntary intoxication as to his knowledge and/or intent, and whether a jury may consider such evidence in determining these issues.

Penal Code section 22 has, as its purpose, to render voluntary intoxication, in and of itself, immaterial to the commission of a crime—in a word, to disallow any argument by a defendant that "I would not have done what I did, and would not have possessed the mental state that I possessed, had I not been in the condition of voluntary intoxication." It has always dealt with voluntary intoxication and the elements of a crime, specifically, the *mental* elements thereof. Formerly, it was phrased in terms of allowing the jury to

consider a defendant's voluntary intoxication in order to "determin[e]" his "purpose, motive, or intent," "whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime . . . ." (1872 Pen. Code, § 22.) Presently, it is phrased in terms of declaring that "[e]vidence" that the defendant was voluntarily intoxicated is "admissible," albeit "solely," "on the issue of whether or not [he] actually formed a required specific intent, or, when charged with murder, whether [he] premeditated, deliberated, or harbored express malice aforethought." (Pen. Code, § 22, subd. (b), as amended by Stats. 1995, ch. 793, § 1; accord, Pen. Code, § 22, as amended by Stats. 1982, ch. 893, § 2, pp. 3317-3318; Pen. Code, § 22, as amended by Stats. 1981, ch. 404, § 2, pp. 1591-1592.)

Penal Code section 22 has nothing to do with aiding and abetting, which is not itself a crime but rather a theory of vicarious liability of one person for the crime of another, and has nothing to do with aiding and abetting's prerequisites of knowledge and intent, which are not themselves elements of a crime but rather conditions for the attachment of such vicarious liability.

With that said, the answer to the question presented proves to be affirmative: A person who is charged with a crime and prosecuted as an aider and abettor may introduce evidence of voluntary intoxication as to his knowledge and/or intent, and a jury may consider such evidence in determining these issues. The reason is this. As a general rule, all relevant evidence is admissible (Evid. Code, § 351) and hence may be taken into account. Evidence is relevant if it has any tendency in reason to prove or disprove a material issue. (*Id.*, § 210.) Plainly, evidence of voluntary intoxication has some such tendency to disprove the knowledge and/or intent prerequisites for aiding and abetting. No exception obtains to render evidence of this sort inadmissible. Certainly, none can be found in Penal Code section 22 itself. To be sure, the provision implies that "[e]vidence of voluntary intoxication" is inadmissible except "on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (Pen. Code, § 22, subd. (b).) To the extent that such implication covers the defendant and the mental elements of a crime, it makes sense, arising as it does from a measure devoted thereto. But to the extent that it is stretched beyond, it does not. Otherwise, one would be forced to conclude that evidence of voluntary intoxication would be inadmissible even on such an issue as the credibility of a witness, including the defendant, based on his condition at the time of the events and/or the time of trial—a result that would certainly be untenable (see, e.g., *People* v. *Barnett* (1976) 54 Cal.App.3d 1046, 1050-1052 [127 Cal.Rptr. 88] [admissibility of evidence

of voluntary intoxication at time of trial as to credibility]; *People* v. *Singh* (1937) 19 Cal.App.2d 128, 129 [64 P.2d 1149] [admissibility of evidence of voluntary intoxication at time of events as to credibility]; *People* v. *Salladay* (1913) 22 Cal.App. 552, 554 [135 P. 508] [same]; *People* v. *Haydon* (1912) 18 Cal.App. 543, 563-565 [123 P. 1102] [admissibility of evidence of voluntary intoxication at time of trial as to credibility]).

**BAXTER, J.**—I respectfully dissent for reasons similar to those expressed in my separate opinion in *People* v. *Whitfield* (1994) 7 Cal.4th 437, 477 [27 Cal.Rptr.2d 858, 868 P.2d 272] (conc. and dis. opn. of Baxter, J.).

As Justice Brown observes in her dissent, "By its terms, Penal Code section 22, subdivision (b) . . . does not apply to aider and abettor liability. An aider and abettor's mental state is not a 'specific intent' within the meaning of section 22(b). Moreover, the very language of section 22(b) [as amended in 1982 and applicable here] limits the admissibility of evidence of voluntary intoxication to situations in which 'a specific intent crime is charged.' " (Dis. opn. of Brown, J., *post*, at p. 1138.)

Under the majority's rationale and holding, an aider and abettor can introduce evidence of voluntary intoxication to negate the mental state required of aiding and abetting liability even where he is charged with only a general intent crime. That result is clearly contrary to legislative intent and policy, and contrary to the policy limitations which this court, in *People* v. *Hood* (1969) 1 Cal.3d 444 [82 Cal.Rptr. 618, 462 P.2d 370], placed on the availability of a voluntary intoxication defense where only general intent crimes are charged.

Under the majority's rationale and holding, an aider and abettor can introduce evidence of voluntary intoxication and ultimately obtain a total acquittal of the general or specific intent crime with which he is charged. That result is patently at odds with this court's recent acknowledgment that the distinction between specific and general intent crimes " 'is a device to "permit evidence of intoxication to reduce the crime to a lower degree, but not to admit evidence of self-induced intoxication if it would result in total acquittal." ' [Citations.]" (*People* v. *Whitfield, supra*, 7 Cal.4th at p. 451.) Negation of the specific mental state required for aiding and abetting would necessarily require "total acquittal" of a defendant who, like Valdez, is charged only on an aiding and abetting theory of liability—a result inconsistent with the very purpose for which the distinction between specific and general intent crimes was drawn in *People* v. *Hood, supra,* 1 Cal.3d 444, a distinction adhered to by the Legislature in its recent amendments of subdivision (b) of Penal Code section 22.

Valdez was tried solely on an aiding and abetting theory of vicarious liability. As the late Justice Broussard observed, "Accomplice liability depends upon a general criminal intent, not upon shared intent to commit the target offense." (*People* v. *Garrison* (1989) 47 Cal.3d 746, 797 [254 Cal.Rptr. 257, 765 P.2d 419] (conc. and dis. opn. of Broussard, J.).) As the majority in this case acknowledge, "[t]he mental state necessary for conviction as an aider and abettor . . . is different from the mental state necessary for conviction as the actual perpetrator." (Maj. opn., *ante*, at p. 1122.) Such is the only conclusion to be drawn from the many decisions of this court that have sought to define the concept of aider and abettor liability referenced in Penal Code section 31. (See, e.g., *People* v. *Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392] [Where a defendant is charged as an aider and abettor "[i]t is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which [*People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318]] holds must be found by the jury."].)

It is settled that the prosecution in this case was not required to establish that Valdez shared Valencia's specific intent to murder or attempt to murder when Valencia fired the shots through the warehouse door. By its express terms, the limited voluntary-intoxication diminished-actuality defense provided for in Penal Code section 22, subdivision (b), as worded and applicable at the time of commission of the crimes and trial in the instant case, was therefore unavailable to Valdez because he was not charged with a specific intent crime for which the prosecution had to prove that he harbored that same specific intent. "In my view this is all we need to decide. Given the particular difficulty of this area of law, wisdom counsels against saying more than is absolutely necessary. . . ." (*People* v. *Whitfield, supra,* 7 Cal.4th at p. 477 (conc. and dis. opn. of Baxter, J.).)

I would affirm the judgment of the majority of the Court of Appeal on this issue.

**BROWN, J.**—I respectfully dissent.

By its terms, Penal Code section 22, subdivision (b) (section 22(b)) does not apply to aider and abettor liability. An aider and abettor's mental state is not a "specific intent" within the meaning of section 22(b). Moreover, the very language of section 22(b) limits the admissibility of evidence of voluntary intoxication to situations in which "a specific intent crime is charged." I would therefore affirm the judgment of the Court of Appeal.

At the outset, Valdez and the majority encounter the general rule that "[n]o act committed by a person while in a state of voluntary intoxication is

less criminal by reason of his having been in such condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation or malice aforethought, with which the accused committed the act." (Pen. Code, § 22, subd. (a), as amended by Stats. 1982, ch. 893, § 2, p. 3317.)

The sole exceptions to this rule are stated in former section 22(b), which provided: "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (§ 22(b), as amended by Stats. 1982, ch. 893, § 2, pp. 3317-3318.) The parties agree that of the mental states enumerated in section 22(b) only "specific intent" is potentially relevant to Valdez's culpability. Hence, by the terms of the statute, Valdez must demonstrate that aider and abettor liability is a "required specific intent" and that "a specific intent crime is charged." He has failed to do so.

The majority first concludes that the mental state for aiding and abetting is a "required specific intent" within the meaning of section 22(b). (Maj. opn., *ante*, at p. 1131.) I disagree. Aiding and abetting "may be a specific mental state, but it is not a specific intent." (*People* v. *Whitfield* (1994) 7 Cal.4th 437, 477 [27 Cal.Rptr.2d 858, 868 P.2d 272] (conc. and dis. opn. of Baxter, J.).)

Rather, as Justice Broussard correctly stated, "Accomplice liability depends upon a general criminal intent, not upon shared intent to commit the target offense." (*People* v. *Garrison* (1989) 47 Cal.3d 746, 797 [254 Cal.Rptr. 257, 765 P.2d 419] (conc. and dis. opn. of Broussard, J.).) The definition of aiding and abetting does not mean that the "aider and abettor must be prepared to commit the offense by his or her own act should the perpetrator fail to do so, nor that the aider and abettor must seek to share the fruits of the crime." (*People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].) An aider and abettor's intent is only the intent to encourage and facilitate the perpetrator in his or her commission of a crime. (*Id.* at p. 561.) The law is satisfied when the aider and abettor, with knowledge of the perpetrator's criminal purpose, commits an act of encouragement or facilitation of the crime, intending to do so. The law does not require the aider and abettor "to do some further act or achieve some additional consequence," as is required for a crime to be deemed one involving specific intent. (*People* v. *Hood* (1969) 1 Cal.3d 444, 457 [82 Cal.Rptr. 618, 462 P.2d 370].)

In this respect, the intent for aiding and abetting is akin to the general intent required for assault. An aider and abettor who hands the perpetrator a

rock to commit the general intent crime of assault has no more specific intent than the perpetrator who uses that rock. The perpetrator's intent to batter the victim, although arguably a "further act" or "additional consequence," is still a general intent. (*People* v. *Hood, supra,* 1 Cal.3d at p. 457.) The same is true for the aider and abettor.

The majority further concludes that the knowledge element of aiding and abetting is a "specific intent" within the meaning of section 22(b). (Maj. opn., *ante,* at pp. 1131-1132.) In so doing, it relies in part on the following language from *People* v. *Whitfield*: "Although implied malice may not fall literally within the *Hood* formulation of specific intent, the element of implied malice that requires that the defendant act with knowledge of the danger to, and in conscious disregard of, human life, is closely akin to *Hood*'s definition of specific intent, which requires proof that the defendant acted with a specific and particularly culpable mental state." (7 Cal.4th at p. 450.) However, *Whitfield*'s analogy between knowledge and specific intent was undoubtedly precisely the reasoning which the Legislature overruled when it made clear in its 1995 amendment to section 22(b) that voluntary intoxication evidence was *inadmissible* on the issue of implied malice. (See maj. opn., *ante,* at pp. 1126-1127.) Moreover, the Legislature deleted any reference to "knowledge" when it amended section 22(b) in 1982.

Finally, the majority concludes that while by its express terms section 22(b) applies only " 'when a specific intent crime is charged,' " this phrase "refers to the same 'required specific intent' for which the statute allows evidence of intoxication, including the intent requirement of an aider and abettor." (Maj. opn., *ante,* at p. 1132.) I would agree that when a specific intent crime is charged, the "required specific intent" is that intent required by the charged specific intent crime. I disagree, however, that this correlation eviscerates the express requirement that "a specific intent crime [be] charged" prior to voluntary intoxication evidence becoming admissible. Aiding and abetting murder and attempted murder is not a "specific intent crime." Indeed, aiding and abetting is not a crime at all; it is a theory of liability.

Here, there are only two possible resolutions to the issue presented: Either voluntary intoxication evidence may always be considered, as the majority concludes, or it may never be considered, as I would conclude, on the existence of the mental state required for aiding and abetting liability, no matter what the charged or target crime might be. Clearly, the latter option is more consistent with the statutory language. Under the majority's approach, voluntary intoxication evidence may be considered for aider and abettor liability even when the target offense is a general intent crime. (Maj. opn.,

*ante,* at pp. 1131-1132.) This result violates the legislative intent and the plain language of section 22(b).

Hence, section 22(b) withholds voluntary intoxication as a defense to aider and abettor liability. Contrary to defendant's assertion, such a resolution does not violate his due process rights by denying him the opportunity to prove he did not possess a required mental state. (See *Montana* v. *Egelhoff* (1996) 518 U.S. 37, 40, 56 [116 S.Ct. 2013, 2016, 2023-2024, 135 L.Ed.2d 361] (plur. opn.) [statute disallowing consideration of voluntary intoxication evidence in determining the existence of a mental state that is an element of a criminal offense does not violate due process]; *id.* at pp. 58-59 [116 S.Ct. at pp. 2024-2025] (conc. opn. of Ginsburg, J.).) The prosecution must still prove the knowledge and intent of the alleged aider and abettor. While the defendant cannot disprove that claim simply by asserting he or she was intoxicated, the defendant can disclaim it by presenting other evidence. For example, in this case Valdez could argue that he never heard any mention of a gun, or that he urged Valencia not to bring a gun. Likewise, in the majority's example of a parent handing a child a baseball bat, the parent could present evidence of the circumstances under which this occurred, for example, at a Little League game. In other words, a defendant may assert such evidence as would be relevant if he or she were sober. What a defendant may not do is rely on his or her own intoxication to deny knowledge and intent.

Moreover, as the Attorney General states, "No claim of unfairness may be based on a premise that the actual perpetrator is necessarily more culpable than the aider and abettor." The aider and abettor is not always less culpable than the perpetrator. Here, it is extremely unlikely Valencia, who was at home sleeping, would have committed the murder and attempted murders absent Valdez's intervention. Moreover, the reverse is also true. Under the majority's approach, if the perpetrator commits a general intent crime, the *perpetrator* cannot introduce evidence of voluntary intoxication, but the *aider and abettor* can. In any event, our goal is to first ascertain not what is fair in each individual situation, but what the Legislature intended.

In sum, section 22(b) does not authorize the use of evidence of Valdez's voluntary intoxication to disprove either the intent or knowledge element of the People's theory that he aided and abetted Valencia. As the Court of Appeal stated, "Such evidence should not have been admitted for that purpose, and it follows that Valdez had no right to instructions as to the significance of the evidence for that purpose. The evidence that was admitted, and the instructions the court gave concerning the evidence, could not have prejudiced Valdez."

I would affirm the judgment of the Court of Appeal.

Baxter, J., concurred.